UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

FRIEDA JOHNSTON                    CIVIL ACTION NO. 6:15-cv-01244

VERSUS                             MAGISTRATE JUDGE HANNA

COMMISSIONER OF THE                BY CONSENT OF THE PARTIES
SOCIAL SECURITY ADMINISTRATION

## MEMORANDUM  RULING

Before this Court is an appeal of the Commissioner's finding of non-disability.
In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the
parties consented to have this matter resolved by the undersigned Magistrate Judge.
(Rec. Doc. 12).  Considering the administrative record, the parties' briefs, and the
applicable law, the Commissioner's decision is reversed, and benefits are awarded.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Frieda Johnston, fully exhausted her administrative remedies
before initiating this action.  She filed an application for Supplemental Security
Income benefits ("SSI") in 2010, alleging disability beginning on August 12, 2006[1]
due to dysautonomia and postural orthostatic tachycardia syndrome.[2]  After her
application was denied, a hearing was held in April 2011 before Administrative Law

---

[1]     Rec. Doc. 5-1 at 104.

[2]     Rec. Doc. 5-1 at 125.

Judge Lawrence T. Ragona.[3]   The ALJ issued a decision,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from the date of the application through the date of the decision.  The claimant requested review of the decision, but the Appeals Council denied review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of the Court's review under 42 U.S.C. § 405(g).

Following judicial review of the Commissioner's decision, judgment was entered remanding the matter back to the Commissioner for further action, with instructions to permit the claimant to update the record, hold another hearing, give controlling weight to the treating physician's opinions or set forth good cause for not doing so, evaluate the claimant's residual functional capacity, reconsider whether the claimant can perform her prior work, and determine whether the claimant is disabled.[6]

---

[3]      The hearing transcript is found at Rec. Doc. 5-1 at 27-56.

[4]      Rec. Doc. 5-1 at 16-21.

[5]      Rec. Doc. 5-1 at 5.

[6]      Rec. Doc. 5-1 at 327-328.

Additional materials were filed in the record,[7] another hearing was held,[8] and the same ALJ again found that the claimant is not disabled.[9]  Because no exceptions were filed, the Appeals Council did not assume jurisdiction, and the ALJ's decision became the final decision of the Commissioner under 20 C.F.R. § 1484(d).  The claimant then sought judicial review of the ALJ's second decision.[10]

## FACTUAL  BACKGROUND

The claimant, Frieda Johnston, was born on August 8, 1986.[11]  She completed high school and a few college courses.[12]  She testified that she was forced to leave college because her health caused her to miss too many classes.[13]  She briefly worked on a part-time basis as a telemarketer and in retail sales.[14]  She testified that she was forced to quit the telemarketing position because the stress of the job caused her to

---

[7]      Rec. Doc. 5-1 at 469-548.

[8]      Rec. Doc. 5-1 at 284-308.

[9]      Rec. Doc. 5-1 at 269-277.

[10]      Rec. Doc. 1.

[11]      Rec. Doc. 5-1 at 104, 286.

[12]      Rec. Doc. 5-1 at 288.

[13]      Rec. Doc. 5-1 at 47-48, 288-289.

[14]      Rec. Doc. 5-1 at 289.

miss work frequently.[15]  While working as a telemarketer, she also fainted and had seizures upon standing up because she was required to sit for a long time without taking a break.[16]  While working in sales at a T.J. Maxx store, her hours were cut because she "kept passing out in the stock room."[17]  While working at Brookstone, she frequently passed out at work, even passing out while on the sales floor.[18]

The claimant applied for benefits at the age of twenty-three, the first hearing was held when she was twenty-five, the second hearing was held when she was twenty-eight, and she will have her thirtieth birthday in a few months.

At the time of the first hearing in 2011, the claimant was living at home with her parents.[19]  At the time of the hearing in 2014, she was living at home with her mother, and her father was an on overseas work assignment.[20]  When her parents lived in Alaska for a year between the two hearings, the claimant attempted to live there but found the environment too harsh.[21]  She returned to Louisiana but had someone with

---

[15]    Rec. Doc. 5-1 at 31.

[16]    Rec. Doc. 5-1 at 39.

[17]    Rec. Doc. 5-1 at 38.

[18]    Rec. Doc. 5-1 at 39.

[19]    Rec. Doc. 5-1 at 29.

[20]    Rec. Doc. 5-1 at 286, 301.

[21]    Rec. Doc. 5-1 at 287.

her at all times.[22]  At the time of the first hearing, she was not attending school or working,[23] and no evidence was presented suggesting that this had changed by the time of the second hearing.

The claimant's medical condition causes her to pass out frequently and have mild seizures.[24]  In April 2011, she was fainting about twice a week.[25]  In the month preceding the second hearing, she passed out approximately five times.[26]  She also is chronically fatigued, requiring a B12 injection every other week.[27]  She is usually too tired to leave the house.[28]   In 2011, she was visiting with friends about once a month,[29] but by 2014, she had lost contact with most of her friends although she occasionally spent time on Facebook[30] and had a fiancé.[31]  She testified that she had

---

[22]     Rec. Doc. 5-1 at 287.

[23]     Rec. Doc. 5-1 at 29, 32.

[24]     Rec. Doc. 5-1 at 33.

[25]     Rec. Doc. 5-1 at 41.

[26]     Rec. Doc. 5-1 at 302.

[27]     Rec. Doc. 5-1 at 33, 40, 290.

[28]     Rec. Doc. 5-1 at 35.

[29]     Rec. Doc. 5-1 at 36.

[30]     Rec. Doc. 5-1 at 299.

[31]     Rec. Doc. 5-1 at 299.

not been out with friends in a long time.[32]  She enjoys reading but gets headaches and

has trouble concentrating.[33]  She experiences painful heart palpitations, joint pain,

sleep problems, and shortness of breath.[34]  In 2014, she was having dizzy spells about

three times per week, lasting from one to three hours at a time.[35]  She complained

about having trouble eating and experiencing frequent nausea.[36]  She cries frequently,

and became emotional during the second hearing.[37]  Her physician is attempting to

find an antidepressant that is compatible with her other medications.[38]  She often

wakes up with headaches and also gets them sporadically, requiring prescription

medication.[39]  She stopped driving, finding it too stressful because she could not

concentrate.[40]  She does not own a computer but occasionally borrows her mother's

---

[32]     Rec. Doc. 5-1 at 300.

[33]     Rec. Doc. 5-1 at 36.

[34]     Rec. Doc. 33, 43.

[35]     Rec. Doc. 5-1 at 292.

[36]     Rec. Doc. 5-1 at 33, 293.

[37]     Rec. Doc. 5-1 at 294-295.

[38]     Rec. Doc. 5-1 at 295.

[39]     Rec. Doc. 5-1 at 302-303.

[40]     Rec. Doc. 5-1 at 288, 301.

laptop.[41]  Being on the computer for more than about an hour causes headaches.[42]  She also complained about memory problems[43] and anxiety.[44]  Stress makes her condition worse.[45]  She does not do housework or laundry, cook, or shop for groceries.[46]  At the time of the 2014 hearing, she had not been shopping for over a month.[47]  In her mother's opinion, the claimant's condition was worsening in 2011.[48]  In the claimant's opinion, it was further worsening in 2014.[49]

On April 28, 2011, Ms. Johnston testified that, in the recent past, she had been fainting approximately twice a week and had passed out the day before.[50]  Although she passes out more when she spends more time on her feet,[51] she has passed out

---

[41]     Rec. Doc. 5-1 at 293-294.

[42]     Rec. Doc. 5-1 at 294.

[43]     Rec. Doc. 5-1 at 37, 300.

[44]     Rec. Doc. 5-1 at 303.

[45]     Rec. Doc. 5-1 at 36.

[46]     Rec. Doc. 5-1 at 34, 293.

[47]     Rec. Doc. 5-1 at 298.

[48]     Rec. Doc. 5-1 at 52.

[49]     Rec. Doc. 5-1 at 303.

[50]     Rec. Doc. 5-1 at 40.

[51]     Rec. Doc. 5-1 at 41.

while lying down.[52]  She described her condition as "scary"[53] and described her existence as boring for a person her age.[54]  She expressed concern about being a burden on her parents.[55]  In 2011, the claimant testified that she would like to be able to complete her education and pursue employment in a counseling field.[56]  In 2014, however, she stated that she had no plans for future employment.[57]

In September 2014, the claimant was taking twelve prescription medications: Clonazepam, Savella, Clonidine, Florinef, Meclinzine, Mag-oxide, Butalbital, Phernergan, Temazepam, Hydroxyzinepam, Trazadone, Tramadol, plus bi-weekly vitamin B12 injections.[58]

The claimant treats with Dr. Charles Thompson, an internist who specializes in the treatment of autonomic diseases and has the same condition that the claimant does.  The claimant also treats with a general practitioner, Dr. Sunshine Little.  At the time of the hearing, Dr. Thompson was on medical leave, and approximately six

---

[52]     Rec. Doc. 5-1 at 42.

[53]     Rec. Doc. 5-1 at 42.

[54]     Rec. Doc. 5-1 at 41.

[55]     Rec. Doc. 5-1 at 36.

[56]     Rec. Doc. 5-1 at 36-37.

[57]     Rec. Doc. 5-1 at 294.

[58]     Rec. Doc. 5-1 at 469.

appointments with him were canceled in the prior two years.[59]  The claimant was attempting to locate another specialist to take over her care.[60]

The claimant's mother testified that she has witnessed the claimant passing out, having seizures, and having memory loss.[61]  She reported that the seizures can be as often as once or twice a week.[62]  The first time she observed the claimant passing out, she was about nine years old.[63]  The claimant reported to Dr. Thompson that she first began having symptoms of dysautonomia at age fifteen.  At some point before March 7, 2007, she was diagnosed with this disorder and the associated disorder called postural orthostatic tachycardia syndrome by a neurologist who performed a diagnostic tilt table test.[64]  When the claimant first saw Dr. Thompson on March 7, 2007,[65] he reviewed her medical records, reviewed the results of the tilt table test, obtained a complete medical history, and examined Ms. Johnston.  His impression was that she had dysautonomia, tachycardia, and fatigue.

---

[59]     Rec. Doc. 5-1 at 290-291.

[60]     Rec. Doc. 5-1 at 297, 302.

[61]     Rec. Doc. 5-1 at 50.

[62]     Rec. Doc. 5-1 at 51.

[63]     Rec. Doc. 5-1 at 54.

[64]     Rec. Doc. 5-1 at 44.

[65]     Rec. Doc. 5-1 at 216-218.

Ms. Johnston saw Dr. Thompson again on May 14, 2007,[66] August 13, 2007,[67]

September 24, 2007,[68] March 17, 2008,[69] October 7, 2009,[70] May 4, 2011,[71] March 29,

2012,[72] and May 29, 2012.[73]  In his treatment notes, Dr. Thompson recorded that Ms.

Johnston was experiencing marked and extreme fatigue, marked exercise intolerance,

syncope (fainting), dizziness, lightheadedness, nausea, tachycardia (rapid heartbeat),

palpitations, visual changes (including graying out and tunnel vision), tremulousness,

proximal muscle weakness, chest discomfort, shortness of breath, gastrointestinal

problems, difficulty concentrating, joint pain, stiffness, arthritis, and muscle pain.  In

October 2009, he noted that she had a very unsteady gait.

On June 18, 2007, Dr. Thompson wrote a letter[74] explaining Ms. Johnston's

diagnosis, as follows:

---

[66]    Rec. Doc. 5-1 at 213-215.

[67]    Rec. Doc. 5-1 at 210-212.

[68]    Rec. Doc. 5-1 at 198-200.

[69]    Rec. Doc. 5-1 at 194-196.

[70]    Rec. Doc. 5-1 at 189-191.

[71]    Rec. Doc. 5-1 at 46; Rec. Doc. 5-1 at 263-265.

[72]    Rec. Doc. 5-1 at 480-483.

[73]    Rec. Doc. 5-1 at 477-479.

[74]    Rec. Doc. 5-1 at 192.

> Ms. Johnston has been diagnosed with dysautonomia. This is an episodic disorder that causes dizziness, nausea, dramatic spikes and drops in blood pressure, tachycardia, palpitation, weakness, intolerance to extremes in heat or cold weather, exercise intolerance, and many other related problems. Virtually all of these patients experience periods of remission, then suddenly find themselves unable to function due to a severe exacerbation of their symptoms. There is no cure to this benign, but disabling, condition. Eventually, after months or usually many years, it could resolve itself. There is simply no way to predict what will happen, or when.

On March 17, 2008, Dr. Thompson opined that Ms. Johnston was unable to hold even a part-time job due to exercise intolerance, pre-syncope, dizziness/lightheadedness, tachycardia, palpitations, nausea, visual disturbances, tremulousness, muscle weakness, chest discomfort, shortness of breath, severe headaches, and sporadic gastrointestinal disturbances.[75]  On February 17, 2009, Dr. Thompson again expressed his opinion that Ms. Johnston was not able to sustain any significant employment due to her symptoms.[76]

On April 16, 2010, Dr. Thompson completed an attending physician's statement for Ms. Johnston's health insurance provider,[77] noting that she had been diagnosed with dysautonomia and postural orthostatic hypotension since at least

---

[75]     Rec. Doc. 5-1 at 486.

[76]     Rec. Doc. 5-1 at 193.

[77]     Rec. Doc. 5-1 at 261.

2007.  He stated that she had a positive tilt table test and exhibits all symptoms of dysautonomia.  He described her symptoms as including near syncope within the first ten minutes of an autonomic function test, fatigue, heat intolerance, nausea, palpitation, and chest pain.  He stated that she cannot use her arms above her head, cannot be exposed to heat or cold, and cannot lift more than twenty-five pounds.

On May 4, 2011, Dr. Thompson completed a medical source statement of ability to do work-related activities.[78]  He stated that, based upon his medical knowledge, clinical findings, and the claimant's medical records, the claimant can sit for only thirty minutes at a time without interruption, can stand or walk for only five to ten minutes at a time without interruption, can sit only two hours out of an eight-hour day, and can stand or walk for only one hour out of an eight-hour day.  He noted that she requires the use of a cane to ambulate, needs to elevate her legs intermittently to relieve her symptoms, would need to take hourly breaks during the work day because of pain, fatigue, tremors enhanced by stress, passing out, near-passing out, palpitations, tachycardia, headaches, and nausea.  He also opined that she would likely miss work or need to leave work early at least once a week because of her symptoms.  Dr. Thompson also prescribed a wheelchair.[79]

---

[78]    Rec. Doc. 5-1 at 263-264.

[79]    Rec. Doc. 5-1 at 265.

On July 26, 2010, the claimant was examined by Dr. Scott C. Chapman at the request of Disability Determination Services.[80]   Dr. Chapman's impression is consistent with that of Dr. Thompson.  He found that the claimant has dysautonomia, which he stated "is a fairly poorly understood disease which causes recurring symptoms such as loss of consciousness and extreme fatigue."  He noted that the claimant takes "multiple medications which have reduced the severity of her symptoms."  He also said that because she experiences sudden and recurring loss of consciousness, the claimant needs to follow precautions similar to those followed by seizure patients by avoiding any type of high risk environments.

On June 25, 2011, the claimant was seen in the emergency room at Opelousas General Hospital for complaints of weakness and dizziness with vomiting and headache.[81]   She had trouble walking and "clear cut positional vertigo."   Resting tachycardia was noted.   She was given IV medications and diagnosed with fibromyalgia, moderate tachycardia, migraine headache, benign positional vertigo, dehydration, vomiting, and urinary tract infection.   She was discharged with prescriptions for Antivert (for vertigo), Fioricet (for headache), Phenergan (for nausea), and Macrobid (for urinary tract infection).   Dr. Thompson mentioned this

---

[80]     Rec. Doc. 5-1 at 224-227.

[81]     Rec. Doc. 5-1 at 488-506.

hospital visit in his treatment notes of March 19, 2012. At that time, Dr. Thompson also discussed the claimant's inability to tolerate some of the medications he prescribed and the difficulty of finding medications that might improve her symptoms. He opined that attempting to work would markedly exacerbate her symptoms. He stated a similar opinion in his treatment note of May 29, 2012.

The claimant saw Dr. Little, her family physician, on August 11, 2014.[82] At that time, she was experiencing generalized body aches and she had swollen lymph nodes. She was diagnosed acute lymphadenitis, malaise, B12 deficiency, and pyuria.

The claimant returned to see Dr. Little on September 11, 2014.[83] At that time, she requested follow-up care for her dysautonomia in light of Dr. Thompson's medical leave. Although she denied any specific complaints, she was tachycardic and requested medication management until a new specialist could be found.

## ANALYSIS

### A. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

---

[82]     Rec. Doc. 5-1 at 517-537.

[83]     Rec. Doc. 5-1 at 508-516.

proper legal standards were used in evaluating the evidence.[84] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[85]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[86]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[87]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[88]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the

---

[84]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[85]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[86]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[87]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[88]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

courts.[89]   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[90]

## B.   ENTITLEMENT TO BENEFITS

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[91]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[92]   A claimant is determined to be disabled only if his physical or mental impairments are so severe that he is unable to not only do his previous work, but cannot, considering

---

[89]     *Martinez v. Chater*, 64 F.3d at 174.

[90]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[91]     42 U.S.C. § 1382(a)(1) & (2).

[92]     42 U.S.C. § 1382c(a)(3)(A).

his age, education, and work experience, participate in any other kind of substantial

gainful work which exists in significant numbers in the national economy, regardless

of whether such work exists in the area in which the claimant lives, whether a specific

job vacancy exists, or whether the claimant would be hired if he applied for work.[93]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a

claimant is disabled.   At step one, a claimant who is working and engaging in

substantial gainful activity will not be found disabled regardless of medical findings.

At step two, a claimant without a severe impairment will not be found disabled.   At

step three, an individual who meets or equals an impairment listed in the regulations

at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without

consideration of vocational factors.   At step four, an individual who is capable of

performing the work he has done in the past will not be found disabled.   Finally, at

step five, if an individual's impairment precludes him from performing his past work,

other factors including age, education, past work experience, and residual functional

capacity will be considered to determine if he can perform any other work.[94]

---

[93]    42 U.S.C. § 1382c(a)(3)(B).

[94]    20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[95] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[96]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[97]

The claimant bears the burden of proof on the first four steps.[98]   At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[99]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[100]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[95]      20 C.F.R. § 404.1520(a)(4).

[96]      20 C.F.R. § 404.1545(a)(1).

[97]      20 C.F.R. § 404.1520(e).

[98]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[99]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[100]      *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[101]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[102]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since May 13, 2010, the application date.[103]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  dysautonomia and anxiety/somatoform disorder.[104]  This finding is supported by evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[105]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels except that the claimant is unable to work

---

[101]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[102]    *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[103]    Rec. Doc. 5-1 at 271.

[104]    Rec. Doc. 5-1 at 271.

[105]    Rec. Doc. 5-1 at 271.

around hazards such as dangerous machinery or unprotect heights and is unable to perform complex work.[106]  The claimant challenges this finding.

At step four, the ALJ found that the claimant has no relevant past work.[107]  This finding is supported by the evidence in the record.

At step five, the ALJ found that the claimant was not disabled from May 13, 2010, the date on which she filed her application for benefits, through January 9, 2015, the date of the decision, because there are jobs in the national economy that she can perform.[108]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

The claimant contends that the Commissioner erred in finding her not disabled. More particularly, she contends that the ALJ erred in failing to give controlling weight to her treating physician's medical opinions and in evaluating her residual functional capacity.

## F.   THE ALJ ERRED IN FAILING TO GIVE CONTROLLING WEIGHT TO DR. THOMPSON'S OPINIONS

In the ALJ's first ruling, he discounted Dr. Thompson's opinions on the basis that the claimant did not see Dr. Thompson more frequently and on the basis that Dr.

---

[106]     Rec. Doc. 5-1 at 272.

[107]     Rec. Doc. 5-1 at 275.

[108]     Rec. Doc. 5-1 at 276.

-20-

Thompson's opinions were not supported by objective medical evidence.  The Court held that the ALJ's findings were erroneous and remanded the matter to the Commissioner with instructions to either give Dr. Thompson's opinions controlling weight or set forth good cause for not doing so.  In his more recent ruling, the ALJ considered the opinions that Dr. Thompson set out in a Medical Source Statement dated May 4, 2011 and in a letter dated March 17, 2008.  The ALJ gave no weight to the 2011 Medical Source Statement because "this opinion of Dr. Thompson is not accompanied by progress notes or examinations to support these limitations."[109]  The ALJ gave little weight to Dr. Thompson's letter of March 2008 because "there are no progress notes or examination results accompanying that support this degree of limitation."[110]  The ALJ also noted that Dr. Thompson's opinions were based on the claimant's allegations and reports of symptoms, which the ALJ found not to be credible.[111]  Additionally, the ALJ criticized the claimant for not seeking more frequent medical treatment.[112]

---

[109]     Rec. Doc. 5-1 at 274.

[110]     Rec. Doc. 5-1 at 275.

[111]     Rec. Doc. 5-1 at 274, 275.

[112]     Rec. Doc. 5-1 at 274.

The claimant again argues that the ALJ erred in failing to give Dr. Thompson's medical opinions controlling weight, and this Court agrees.   The ALJ has sole responsibility for determining the claimant's disability status.[113]   While a treating physician's opinions are not determinative of disability, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight by the ALJ in determining disability.[114]   In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[115]   If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight, but only after showing good cause for doing so.[116]   Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by

---

[113]     *Newton v. Apfel*, 209 F.3d at 455.

[114]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[115]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

[116]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

-22-

the evidence.[117]  Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[118]

Dr. Thompson has treated Ms. Johnston since March 2007, and saw her at least nine times between March 2007 and May 2012, a period of five years.  A physician qualifies as a treating source if the claimant sees the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical conditions.[119]  No evidence was presented to establish how frequently a patient with dysautonomia should be seen by her physician.  In this case, the claimant saw Dr. Thompson, who is located in Pensacola, Florida, more frequently when she lived in Alabama and less frequently after she moved to Louisiana.  The claimant also had difficulty scheduling appointments with Dr. Thompson because, like the claimant, Dr. Thompson suffers with dysautonomia,

---

[117]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-44.

[118]    *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

[119]    *Huet v. Astrue*, 375 Fed. App'x 373, 376 (5th Cir. 2010), citing 20 C.F.R. § 404.1502.

has had other health problems, and was on medical leave at times.  Dr. Thompson noted, however, that he has been in touch with the claimant by telephone during times when he has been unable to schedule appointments.[120]  The claimant has been looking for another treating physician but dysautonomia is such an uncommon disorder that she has had difficulty finding another doctor.  In fact, she testified that even the neurologist who originally diagnosed her condition declined to treat her because he was not sufficiently familiar with the disorder.[121]

This Court finds that the length of the claimant's treatment with Dr. Thompson, the frequency of Dr. Thompson's examination of the claimant, and the nature and extent of the doctor-patient relationship are sufficient to entitle his opinions to the weight customarily given to a treating physician.

The ALJ gave great weight to the opinions of Dr. Chapman.  It is undisputed that Dr. Thompson is a specialist in treating dysautonomia, and the record contains no evidence that Dr. Chapman has any such expertise.  A specialist's opinion is generally accorded greater weight than that of a nonspecialist.[122]  Therefore, if Dr. Thompson's opinions differed from Dr. Chapman's, Dr. Thompson's would be

---

[120]     Rec. Doc. 5-1 at 480.

[121]     Rec. Doc. 5-1 at 36.

[122]     *Newton v. Apfel*, 209 F.3d at 455.

-24-

entitled to greater weight.  In this case, however, Dr. Chapman's opinions are not significantly different from Dr. Thompson's.  He too found that the claimant has dysautonomia, and he opined that she should observe precautions similar to those for seizure patients, including avoiding any high risk environments due to the possibility of sudden and recurring loss of consciousness.  He expressed no opinion as to whether the claimant can or cannot work.  He did attach an orthopedic range of motion analysis to his report, but there is no indication that it is helpful to determining the claimant's functionality.  In summary, Dr. Chapman offered no opinions that refuted any of Dr. Thompson's opinions.  Dr. Thompson's opinions should, therefore, be given greater weight than Dr. Chapman's.

Dr. Thompson's opinions have been consistent across the entire time period that he has treated the claimant.  The ALJ discounted Dr. Thompson's opinions from March 2008 and May 2011 but failed to mention Dr. Thompson's consistent assessment of the claimant's functional impairments in April 16, 2010 and May 29, 2012.  Thus, the ALJ failed to note that Dr. Thompson has, throughout the time that he has been treating the claimant, consistently assessed her functionality.

Finally, the ALJ discounted Dr. Thompson's opinions because they were not supported by contemporaneous progress notes or examinations.  This ignores the fact that the claimant's condition was diagnosed with the use of a tilt table test that

objectively determines whether the condition exists.  It also ignores the fact that Dr. Thompson examined the claimant on nine occasions between March 2007 and May 2012 and prescribed various medications to treat her symptoms on each of those occasions.  Tachycardia, one of the symptoms of the claimant's condition, was present upon examination by Dr. Thompson on March 7, 2007, September 24, 2007, March 17, 2008, October 7, 2009, and March 29, 2012.  It was also present when the claimant was examined in the emergency room of Opelousas General Hospital in June 2011 and when the claimant was examined by Dr. Little in September 2014.

Most important, there is no evidence in the record that contradicts Dr. Thompson's findings or his opinions.  Like Dr. Thompson, Dr. Chapman found that Ms. Johnston suffers with dysautonomia.  Unlike Dr. Thompson, however, Dr. Chapman did not evaluate Ms. Johnston's functional capacity except to advise that she avoid any type of high risk environment due to the sudden and recurring loss of consciousness.  Although an orthopedic range of motion analysis is attached to Dr. Chapman's report, it is unclear what significance such an evaluation has with regard to a patient with Ms. Johnston's disorder.  Dr. Thompson's opinions are not conclusory, they are not unsupported by medically acceptable clinical laboratory diagnostic techniques, and they are not otherwise unsupported by the evidence. Accordingly, this Court finds that the ALJ failed to show good cause for discounting

Dr. Thompson's opinions and, for that reason, failed to apply the proper legal standard when deciding to reject the opinions of the claimant's treating physician.

## G.   THE ALJ ERRED IN EVALUATING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

The claimant argues that the ALJ erred in evaluating her residual functional capacity by failing to address her nonexertional impairments.  Dr. Chapman stated that dysautonomia is characterized by "extreme fatigue."[123]  In his most recent treatment note, Dr. Thompson stated that the claimant has marked fatigue.  In March 2008, he described dysautonomia as " very fatiguing condition" and stated that the claimant's fatigue interferes with activities of daily living.[124]  In April 2016, Dr. Thompson included fatigue among the factors indicative of the claimant's dysautonomia.[125]  In May 2011, Dr. Thompson identified fatigue as one of the factors relevant to the claimant's employability.[126]  The claimant testified at both hearings with regard to her chronic fatigue.  The ALJ mentioned fatigue in evaluating the claimant's residual functional capacity, but failed to address how chronic fatigue, a nonexertional impairment, impacts the claimant's residual functional capacity.

---

[123]     Rec. Doc. 5-1 at 227.

[124]     Rec. Doc. 5-1 at 486.

[125]     Rec. Doc. 5-1 at 261.

[126]     Rec. Doc. 5-1 at 264.

Dr. Thompson opined that Ms. Johnston can sit for only thirty minutes at a time, can stand or walk for only five to ten minutes at a time, can sit for only two hours out of an entire work day, and can stand or walk for only one hour out of an entire work day.[127]  But the ALJ found that Ms. Johnston has the residual functional capacity to perform a full range of work at all exertional levels with the exception that she is precluded from working at unprotected heights and around hazardous machinery.  This finding is incompatible with Dr. Thompson's opinions and fails to take into account the claimant's nonexertional impairments.  The ALJ further found that Ms. Johnston is not capable of returning to her prior work as a sales clerk but is capable of performing other jobs that exist in the national economy.[128]   This conclusion is inconsistent with the vocational expert's testimony that dizzy spells or fatigue as described by the claimant would preclude her from being employable as would passing out, nearly passing out, palpitation, or tachycardia if they necessitated unscheduled breaks during the work day.[129]

---

[127]     Rec. Doc. 5-1 at 262.

[128]     Rec. Doc. 5-1 at 19-20.

[129]     Rec. Doc. 5-1 at 306-307.

An ALJ is required to make credibility determinations,[130] and the ALJ's credibility determinations are entitled to great deference.[131]  But it is improper for an ALJ to rely upon his own unsupported opinion as to the limitations presented by the applicant's medical conditions.[132]  Further, an ALJ is obligated to consider subjective evidence of nonexertional ailments.[133]  The claimant's testimony concerning the extent of her fatigue was not disputed, and Dr. Chapman's analysis of the claimant's functionality failed to address the effect that chronic fatigue has on the claimant.  The ALJ also either failed to fully consider the effect that the claimant's nonexertional impairments have on her ability to sustain employment or improperly evaluated her credibility by discounting the effect of her nonexertional impairments without justification.  Accordingly, this Court concludes that the ALJ's residual functional capacity evaluation is not supported by substantial evidence in the record.

---

[130]    *Stanridge-Salazar v. Massanari*, 254 F.3d 70, at *2 (5th Cir. 2001).

[131]    *Broadnax v. Barnhart*, 54 F. App'x 406, at *1 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d at 459.

[132]    *Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009); *Ripley v. Chater*, 67 F.3d at 557.

[133]    *Beck v. Barnhart*, 205 Fed. App'x 207, 212 (5th Cir. 2006), citing *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

## CONCLUSION AND RECOMMENDATION

For the reasons explained above, this Court finds that the Commissioner's ruling that Ms. Johnston is not disabled is not supported by substantial evidence and was reached by the application of improper legal standards.  This Court has the power, under 42 U.S.C. § 405(g), to reverse a decision of the Commissioner of Social Security with or without remanding the matter for rehearing.  This matter was previously remanded, and the Commissioner has again issued a ruling that was reached by the applying improper legal standards and is not supported by substantial evidence in the record.  Accordingly,

IT IS ORDERED that the Commissioner's decision is REVERSED pursuant to the fourth sentence of 42 U.S.C. § 405(g), and Supplemental Security Income benefits shall be awarded from August 12, 2006 forward.

Signed in Lafayette, Louisiana, this 18th day of March 2016.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE